## James A. Jamison and William R. Jamison,

### *vs.*

## Thomas J. Craven, Executor of Thomas Jamison, deceased; Edgar Jamison, Clarence Jamison and Oliver Jamison.

*New Castle, Feb. T. 1872.*

An independent clause, added to a devise in fee simple to the testator's wife, providing for a limitation if she should die " without having sold and " conveyed the said tract of land by any deed of conveyance or given and " devised the same by last will and testament," is repugnant to the nature of the estate devised to the wife, which cannot be so qualified.

The absolute right of disposal is an incident of an estate in fee, and even assuming that it can legally be qualified, it will be presumed not to have been so intended : and a clear and manifest purpose to that effect must appear on the face of the will.

Although a delivery is essential to the transfer of title under a deed, no formality, either of words or action is necessary to constitute it. Anything which signifies the intention of the grantor to part with his control or dominion over the paper, so that it may become a muniment of title in the grantee, operates as a legal delivery.

The measure of proof required to establish the fact of delivery, differs with the character of the deed; whether it be voluntary or made to give effect to a sale. In the former case, delivery is not presumed but must be proved strictly, but if the conveyance be for a valuable consideration and absolute on its face, the intention to consummate the conveyance by the delivery of the deed is inferred from the grantor's parting with the possession of it, either to the grantee or to some third person.

In the case of ordinary conveyances for a valuable consideration, a rule requiring formal proof of delivery would be intolerably mischievous to titles.

When the deed, after being executed, was left with the notary who took the acknowledgement, proof of his treatment of the paper was admitted, after his death, as evidence explanatory of the character of his possession of it, upon the same principle which admits declarations accompanying an act, as part of the *res gestae.*

A *prima facie* title to real estate shall not be set aside upon mere suspicion, but upon proof only : and the proof must be sufficiently definite as to the ground of defect to enable the Court to know what it is doing.

The necessity for caution in dealing with titles to real estate, on the part of a court of equity, is much increased when a long time has elapsed, and all the parties to the original transaction are dead.

Leading questions, even upon points material to the issue, are sometimes admissible from necessity, when the subject is of such a nature that without them, the full knowledge of the witness upon the precise point to which the proof is directed cannot be elicited. But in such case, the leading question is admitted *after, and only after*, the unassisted recollection of the witness is fully exhausted by a general interrogatory, separated by distinct number from the specific one.

Declarations of a deceased grantor tending to show that she had not made the deed held inadmissible.

Complainants seeking to avoid a deed, cannot support their case by proof of their own acts, nor by offers of compromise, even when made by the grantee or his representatives, *a fortiori* when made by the party who is seeking to set them up.

BILL IN EQUITY TO SET ASIDE A DEED.—This bill is filed to set aside a deed, dated August 18, 1847, purporting to have been executed by Mary Houston, deceased, to Thomas Jamison, deceased, under which Jamison held possession at his decease. The defendants now hold as his devisees. The complainants claim under the will of George Houston deceased. By this will, the farm in controversy was devised to Mary Houston in fee simple, with a provision that, if she should die without having sold and conveyed it in her lifetime, or devised it by will, then it should go over to the three children of James Jamison deceased, of whom the complainants are the survivors.

The devise was in these words :

"I do hereby give and devise unto, my said wife "Mary Houston, and to her heirs and assigns, all that "the aforesaid tract of land which was granted and

"assured unto me in fee simple, by virtue of the deed-
"poll above mentioned together with all the buildings,
"improvements and hereditaments. But it is my will,
"nevertheless, that if my wife Mary Houston shall die
"without having sold and conveyed the said tract of
"land by any deed of conveyance or given and devised by
"a last will and testament, then and in such case the said
"tract of land with the buildings, improvements and
"appurtenances shall pass and belong to the following
"named children of the said James Jamison deceased, &c."

The equity of the bill is, that there was no legal
delivery of the deed to Jamison, but that it came to his
possession surreptitiously, after Mrs. Houston's death and
passed no title ; so that Mrs. Houston having died with-
out any effectual conveyance, and also intestate, the
complainants are entitled as George Houston's devisees.
Much evidence was read bearing upon the question of the
delivery of the deed to Jamison, and so far as it has been
deemed material, it is stated in the opinion of the Chan-
cellor.

THE TESTIMONY was taken under commission issued
upon interrogatories filed. Among the complainants' in-
terrogatories excepted to, were the following :

12. Had you or not, about the time or after the death
of Mary Houston, any conversation with Thomas Jamison
concerning a deed for the Jamison corner farm ? If yes,
state all the particulars of such conversation, and whether
or no the said Thomas Jamison said, on that occasion,
that he had no deed for the said farm, or that his mother
had died without making him a deed, or words to that
effect. Declare fully all your knowledge.

13. Did you or did you not, after the death of Mary
Houston, have a conversation with Thomas Jamison in
regard to the Jamison corner farm in St. Georges Hundred ?

If yea, state all the particulars of said conversation, with the time, place and circumstances under which it was held, and whether or no said Thomas Jamison then said that his mother made no deed to him for the farm in her life time, and whether or no he also stated that, after the death of his mother, Mary Houston, he had found a deed, and if yes, state from whom or by what means he obtained possession of it. Declare fully.

14. Had you ever any conversation with Thomas Jamison in his life time, and in the life time of Mary Houston, in relation to the making of a will by her ? If yea, state the time, place and circumstances of said conversation. State whether or no the said Thomas Jamison said he came to see you at his mother's request to visit her and write a will for her ? Whether or no the said Thomas Jamison then said how his mother intended to will the Jamison corner farm, and whether or no he said that his mother would leave it to the boys (meaning complainants) and whether or no he expressed a desire for them to have it ? Declare fully all that was said.

15. Were you or not acquainted with the habits of Mary Houston in the management of her pecuniary interests ? Was she a prudent person, managing her affairs with economy and thrift, or of the opposite character ? Had she or not, at the time of her death, to your knowledge, any money on hand, and do you know, or can you say, if she had, from what sources it was received, and whether or no Thomas Jamison had paid her any money on account of the purchase money of the Jamison corner farm, the deed for which was dated August 17, 1848 ?

16. Had you, during the lifetime of Mary Houston, any conversation with her about the Jamison corner farm ?˙ If yea, state the time and place, with all the circumstances and facts of the said conversation, and what was said by Mary Houston, and whether or no, in said

conversation she said the said farm, at her death, should belong to her son James Jamison's children, or that she intended to leave it to them ? If such conversation was had, state how long before her death it took place.

17. Had you, about the time of the death of Mary Houston, any conversation with Thomas Jamison in relation to the Jamison corner farm ? If yea, state when such conversation took place, what led to it, and the nature, object and character of the said conversation. State, also, whether or no said Jamison expressed any disappointment in regard to his mother's disposition of the said farm ? Did he or not say, on that occasion, that he had *no deed* from his mother for the said farm ? Declare fully all your knowledge.

18. Did you or not, after the death of Mary Houston, hold conversation with Thomas Jamison, in which any reference was made to the Jamison corner farm, and whether, on that occasion, if you had such conversation, the said Thomas Jamison declared what he would do with the farm if he could get it, and whether or no he referred, in such conversation, to his brother James' boys, and if so, what he said ? Declare fully all that passed.

21. Did or did not Thomas Jamison, on the occasion referred to in the last interrogatory, give any reasons for his not improving the said farm in accordance with your suggestion ? If yea, state fully all that he said. Did he or not refer to the deed under which he held the farm ? If yea, state exactly what he said about the deed. Did he or not say that the deed he had for the farm was worth nothing to him, if the boys (the complainants) went about it right ? Did you or not say to Thomas Jamison, on the occasion last referred to, that he ought to put new fencing on the farm ? If yea, state his reply to that suggestion. Did he or not say that he would do no more than he could possibly help, for he did not know how long he could hold it, or words to that effect ? Declare fully all he said.

22. Did you know Mary Houston, widow of George Houston, in her lifetime? If yea, state when she died, and if, about that time, you had any conversation with Thomas Jamison in regard to his title to the Jamison corner farm in St. Georges hundred. If yea, state fully all the said conversation, and say whether or no said Jamison said he would lose the said farm because his mother had made him no deed. Did he or not inform you whether he had paid any money for the farm, and did he or not, on a subsequent occasion, say that he had found a deed, and from whose custody or possession he had obtained it? Declare fully all that was said by said Thomas Jamison, and all your knowledge.

23. Were you acquainted with the farm in St. Georges hundred, formely owned by James Jamison, dec'd., and called the Jamison corner farm? If yea, state by whom the said farm was worked and carried on from the death of George Houston to the death of Mary Houston, and for whose use the rents were paid. Had you, at any time after the death of Mary Houston, and about the time of her death, any conversations with Thomas Jamison in respect to the said farm, and especially as to his having or holding a deed for it from his mother in her life time. If yea, state the said conversation, whether on one or more accasions, fully with all particulars. State whether or no the said Thomas Jamison said to you, or in your hearing, that, at the time of his mother's death, he had or had not a deed for the said farm. Whether or not he informed you, afterwards, that he had found or obtained possession of a deed, and if yea, from whom and by what means he obtained it, and whether or no he informed you that he had or had not paid any part or all the consideration of Three Thousand dollars of said deed?

24. Had you ever any conversation with Mary Houston in her life time, in regard to the Jamison corner farm in St. Georges hundred? If yea, state whether she held it

during her life, and whether she, at any time, declared how she intended to dispose of it? Did you or not ever hear Mary Houston, shortly before her death, say to whom the said farm would belong at her death? If yea, state such conversation with every particular.

25. Did or did not the complainants, or either of them, or any one in their behalf, in the life-time of Thomas Jamison, or since his death, consult with you as to any knowledge you had of the said alleged coveyance of the Jamison corner farm by Mary Houston to Thomas Jamison, with the purpose of contesting the validity of the said deed, and setting up a claim by the complainant to the said farm under the will of George Houston? Declare fully.

26. Have you any information, derived from Thomas Jamison in his lifetime, or from his representatives since his death, that a proposition for a compromise of the claim of the complainants to the said Jamison corner farm was submitted, in behalf of the complainants, to Thomas Jamison in his lifetime, which was pending at his death, and been renewed since his death to his representatives? If yea, state fully such knowledge.

The several grounds of exception taken to the foregoing interrogatories were as follows:

The 13th, 14th, 15th, 17th, 18th, 21st, 22d, 23d interrogatories were excepted to simply as containing leading questions.

The 16th interrogatory was excepted to on the ground "that it contains a leading question and proposes to con- "tradict the deed of Mrs. Houston to Thomas Jamison " by declarations not made in his presence."

The 24th interrogatory was excepted to on the ground "that it is a leading question and proposes to contradict

"the deed of Mrs. Houston by her own statements, made
"in the absence of the party sought to be affected by
"them."

The 25th interrogatory was excepted to on the ground
"that it seeks to make the declaration of the complain-
"ants, in the absence of the parties sought to be effected
"by their evidence against those parties."

The 26th interrogatory was excepted to on the ground
"that it seeks to use propositions of compromise as evi-
"dence against the defendants, and to prove *ex parte* acts
"and declarations of the complainants, and their agents
"to secure evidence in behalf of the complainants."

THE CHANCELLOR :—

The exceptions to the 15th and 18th interrogatories
are overruled because those interogatories, excepted to as
being leading, are not subject to that objection. The other
interrogatories excepted to as leading, viz : the 12th, 13th,
14th, 17th, 21st, 22d, and 23d, are leading, and in their
present form, must be overruled ; but the inquiries which
in those interrogatories are leading, relate to subjects upon
which leading questions are admissible if properly framed,
and therefore, leave will be given to reform these interrog-
atories in accordance with the views hereinafter ex-
pressed.

Leading questions, even upon points material to the
issue, are sometimes admissible from necessity, when the
subject is of such a nature that without them, the full
knowledge of the witness upon the precise point to which
the proof is directed, cannot be elicited.   For example,
where the transaction involves numerous items or dates ;
so, where from the nature of the case, the mind of the
witness cannot be directed to the precise subject of inquiry
without a particular specification of it ; as where he is

called to contradict another as to the contents of a letter which is lost, and cannot, without suggestion, recollect all its contents, the particular passage may be suggested to him ; so, where a witness is called to contradict another who has testified to particular expressions, the contradicting witness may be asked whether such expressions were used. So, generally, it is said, leading questions to a witness are allowed " where an omission in his testimony is " evidently caused by want of recollection which a sug- " gestion may assist." I *Green. Ev. Sec.* 435 ; 2 *Dan. Ch. Prac.* 1047, *n.* (1.)

It is especially in undertaking to detail past conversations or the contents of some written paper that a witness is liable to omit something, even though not forgotten, until it is recalled to his recollection ; the matter thus omitted may be the very object of taking the proof—say, the remark or statement of a party upon some single point, embraced in a conversation more or less general. In such cases, an inquiry directed to the specific matter upon which the recollection of the witness is desired must be admitted *after and only after*, his unassisted recollection has been fully exhausted. When the witness has first fully stated all he can remember of a conversation or writing, much will be done to avoid the mischief of leading questions afterwards put to him ; for (1) if the witness, under the general interrogatory, has already spoken as to the matter sought to be proved, he will have stated it as he remembered it; unassisted and in his own language, and will be the less apt, afterwards, to give an answer shaped by the terms of the specific interrogatory ; and (2,) his answer to the general interrogatory, if it do not include the matter afterward inquired about, or if it should, then his manner of stating it, compared with his answer to the specific interrogatory, will be open to comment, and afford, generally, a fair test of his honesty and accuracy.

Oral examinations have just here great advantage:

for the court or the examiner can see whether the general recollection of the witness has been fully exhausted, and can better mould the leading questions if found necessary. It is impossible to frame written interrogatories in advance, so as, in every case, certainly to extract the whole knowledge of the witness, and yet avoid all possible disadvange of leading questions. We must be content to shape the interrogatories, as far as possible, to this end, and to subject the testimony then taken to careful scrutiny.

The course then will be, to put first, the general interrogatory, inquiring (in a case like this) whether the witness recollects a certain conversation, referring to the time, place and such attending circumstances as will direct his attention to it, and requiring him to declare and set forth his whole knowledge and recollection of it.

I think the general interrogatory should, with reasonable certainty, designate the time and place of the conversation, not only for the assistance of the witness, but fairly to enable the adverse party to cross examine and adduce counter testimony. It is presumed that the time and place is always known or may be approximated, as interrogatories are framed with some knowledge of the facts sought to be proved.

Following the general interrogatory and numbered separately from it, interrogatories directed to the specific matter sought to be elicited, may be framed upon the supposition that the witness has before stated all he could recollect without this assistance  It should be introduced in some such way as this : If, in answer to the last interrogatory, you have referred to a conversation such as is therein inquired of, and have set forth all your knowledge and recollection touching the same, then state more particularly whether, in such conversation, anything was stated by the said A. B. touching &c.  The inquiry here following, should be no further leading than is

absolutely requisite to point the attention of the witness to the matter inquired about.

The object of separating by distinct numbers, the specific, from the general interrogatory is, that the commissioner may exhaust the recollection of the witness and close his examination under the general interrogatory, before the one following shall be read to him. The witness should not know that there is any other than the general interrogatory until after the commissioner is satisfied that he has, under that, stated his full, unassisted recollection.

The concluding part of the 22d interrogatory is especially exceptionable. I allude to the inquiry, " and did " he or not, *on a subsequent occasion,* say that he had found "a deed, and from whose custody or possession he had " obtained it? First, the particular conversation is not sufficiently designated. Again, there is no general interrogatory directed to it, and besides, more than one conversation should not be inquired about in one interrogatory.

The 16th and 24th interrogatories are excepted to as seeking to affect the defendant by Mrs. Houston's declarations. I can find no principle upon which to admit such declarations; and several decisions in like cases are adverse. In *Bartlet vs. Delpret* 4 *Mass.* 702, the precise question was raised, very fully argued and considered, and the evidence rejected. There the declarations were by a deceased grantor to the effect that he had not made the deed, the case being between the grantee under the deed, and devisees under the decedent's will. In *Romig vs. Romig,* 2 *Rawle* 241, trover for bonds held by an intestate's son, who claimed as under a gift from his father, evidence of the intestate's declarations tending to negative a gift rejected. See also *Scull et al. vs. Wallace's Ex'rs.* 15 S. & R. 231, 1 *Cow.* 1 *Hill's notes to Ph. on Ev.* 276 and 241.

41—DEL. CH. IV.

The 25th interrogatory is clearly inadmissible. It seeks to support the case of complainants by proof of their own acts directed towards contesting the complainants' title.

Equally so is the 26th interrogatory. Offers of compromise, even if made by Thomas Jamison or his representatives, would be inadmissible. *Gresley* 356. *A fortiori* when made by the defendants, the party who is seeking to set them up.

THE CASE CAME ON to a hearing and was argued at the September Term, 1871, the decree being entered at the February Term, 1872:

*G. B. & J. H. Rodney,* for the complainants.

Both parties stand in equally meritorious positions, being children of brothers, one set claiming under their grandfather, the other their father.

A distinct objection to the deed is, that its execution was under a power only to *sell* or *devise,* not to *give.* The consideration was, in part, natural affection ; and it is clear, from the evidence, that no money came into Mrs. Houston's estate, and the attesting witness saw none pass ; besides, the receipt is not signed.

(1.) In this case, there was no delivery until after Mrs. Houston's death, by Huston, and there can be no legal delivery after the death of the grantor. 3 *Washb. on R. R.* 602 ; *Thompson's Ex'rs. vs. Lloyd,* 49, *Pa. St.* 127 ; *Jackson vs. Leek,* 12 *Wend.* 105 ; *Fay vs. Richardson,* 7 *Pick.* 94.

(2). In any delivery, there must be acceptance, express or implied. Where the deed is for the grantee's benefit, acceptance is presumed ; but not, as here, where the grantee was present, the deed executed at his instigation and no acceptance appears. The proof is, that the

attesting witness saw no delivery, and Jamison afterwards repeatedly said he had no deed, which implied a dissent or want of acceptance.    3 *Washb. R. P.* 602 ; *Jackson vs. Richards*, 6 *Cow.* 619 ; *Younge vs. Guilbeau*, 3 *Wall*, 641.

(3.) Delivery to a third person must be expressly for the grantee.    *Shep. Touchst.* 58 ; *Co. Litt.* 36. *a* ; *Maynard vs. Maynard*, 10 *Mass.* 456 ; *Jackson vs. Phipps*, 12 *Johns.* 422 ; *Jackson vs. Dunlap*, 1 *Johns. Cas.* 114 ; *Porter vs. Buckingham*, 2 *Harring.* 199.

The only theory consistent with the facts is, that the deed was left by Mrs.  Houston  with  Huston, either as an escrow to await the performance of some condition by Jamison, or for delivery to him after her death.  If the former, the performance must be shewn, which is not done. If the latter, the title fails, as before argued.

There has been no *laches* on the part of the complainants ; at the date of the transaction and for some  years they  were infants and after their majority there was no delay not properly accounted for, and as the  claim rests on fraud there could be no *laches* to affect their rights. 1 *Madd. Ch.* 205.

*T. F. Bayard,* for the  defendants.

This deed was made over twenty one years before the bill was filed, within which time as might be expected, direct evidence is lost and we are left to presumptions, all of which are favorable to Jamison, arising from facts at and after the date of  the deed exactly consistent with it.  Very serious *laches* is apparent, the complainants having slept on their alleged rights from eight to ten years after their majority, part of which was in Jamison's lifetime. Though the complainants are within the saving of the statute of limitations, equity will not  relieve in a case, wholly equitable in its nature, after  a  considerable lapse of time, especially after the death of the party to be affected.

*Adams Eq.* 227 ; *Smith vs. Clay*, 3 *Bro. C. C.* 639. The period of *laches* runs from the time when a party is put to reasonable notice in the absence of any fraudulent conceal-ment. *Carr vs. Hilton*, 1 *Curt. C. C.* 390.

The power was ample to support the deed. The intention is shewn by the prior bequest of the debts absolutely in lieu of which, by the codicil, the land was substituted as an equally absolute gift. It makes a devise in fee, and adds, not a condition, but a contingency, "—if she dies without having sold or conveyed," by any form of conveyance, &c.

This is not a mere power but one coupled with an interest. There is no trust of any proceeds ; they were, if any, to be hers and therefore whether any or not was at her election.

The case for complainant is put upon the want of sufficient delivery to complete an admitted contract of sale. Delivery is essential, but need not be formal. The test is, does the instrument remain under the control of the grantor. If the deed is found in the grantee's hands, both delivery and acceptance are presumed, subject, of course, to evidence that it has been surreptitiously obtained. 2 *Cow. & Hills, notes to Ph. on Ev.* 826-831 ; *Scrugham vs. Wood*, 15 *Wend.* 545 ; 4 *Kent Com.* 445 ; *Garnons vs. Knight*, 5 *B. & C.* 671 ; *Verplanck vs. Sterry*, 12 *Johns.* 535.

THE CHANCELLOR:—

An objection preliminary to the consideration of the main question is taken to the validity of Mrs. Houston's deed, even supposing it to have been duly delivered,— upon the ground that Mrs. Houston's power of disposal under George Houston's will was limited to two modes, either of sale and conveyance or devise, and that this deed was in part voluntary, or for the consideration of

natural love and affection only, and is not therefore within the power of sale which it is argued contemplates a sale for a full valuable consideration.

Let us advert to the will and codicil. The will made November 13, 1845, bequeaths to the widow, Mary Houston, certain debts due the testator from the sons of James Jamison, deceased, which were charges on the farm now in controversy. Some time after the execution of the will the testator bought the farm thereby extinguishing the charges upon it. He then made this codicil wherein after reciting the provision of the will for his widow, the subsequent purchase of the farm and his purpose now to devise to her the land in lieu of the charges on it which had been extinguished, he proceeds to devise to her the farm in fee simple. He does not expressly qualify the estate devised to her or her power over it ; but adds an independent clause to the effect that if his wife should die "without " having sold and conveyed the said tract of land by any " deed of conveyance or given and devised the same by a " last will and testament," then the farm to " pass and " belong " to the children of James Jamison, deceased, &c.

It will be observed then that Mrs. Houston makes this deed not in execution of a power, but as the devisee in fee simple ; and the question material to its validity is whether the absolute right of disposal incident to her estate in fee, either by gift, sale or devise is restricted by the clause limiting the farm over to James Jamison's children in the event of her dying without having sold or devised it. I think in the first place such a restriction seems to be repugnant to the nature of the estate devised to Mrs. Houston, which is a fee simple. It is not only so made by the words of limitation, but the qualities of a fee simple are expressly given to it by the clause in question, which recognizes her right of disposal either by sale for her own use exclusively or by devise,—rights not conferred as a bare power but treated by the testator as rights of pro-

perty in the widow incident to the estate in fee just before devised to her.  As an estate in fee it carries the absolute right of disposal, which can no more be qualified by excluding the power to give the same, than it can be declared altogether inalienable.  It was once held as the full extent to which the power of disposal by the tenant in fee could be restrained, that a restriction against alienation to a particular individual might be restrained ; but even that is doubted by Chancellor Kent as questionable upon principle. 4 *Kent's Com.* 132.   But if I am in error on this point it is not material ; for taking the whole scope of this provision I am clearly of opinion that the testator did not intend to qualify his widow's power of disposal in any mode she might prefer, but only to provide against a descent of the property under the intestate law in the event of his widow's leaving it wholly undisposed of.   The special reference to her dying without having sold and conveyed, and without having devised, was not meant to be exclusive or restrictive but merely declaratory of what naturally suggested themselves as the usual and most likely modes of disposal.  The legal principle of construction here applicable is that the absolute right of disposal as an incident of the estate in fee, even assuming that it can legally be qualified, will be presumed not to have been so intended, and a clear and manifest purpose to that effect must appear on the face of the will.   Now I cannot, upon a fair and reasonable interpretation of this codicil, gather that intent.   It is not necessary to consider how in any event Mrs. Houston's deed would be treated upon the question whether as a gift or a sale, the consideration being a mixed one of money and natural affection.   We may now proceed to the case made by the bill. It presents a single issue of fact, viz. : whether there was a legal delivery to Jamison of the deed executed by Mrs. Houston.   Although a delivery is essential to the transfer of title under a deed, no formality either of words or of action is necessary to constitute it.   Any thing which

signifies the intention of the grantor to part with his control or dominion over the paper, so that it may become a muniment of title in the grantee, operates as a legal delivery. The question of delivery is purely one of intention. With respect to the measure of proof required, a difference is recognized in the cases depending upon the character of the deed, whether it be voluntary or made to give effect to a sale. In the former case the intention to part with the control of the deed is not presumed and a delivery must be proved strictly. Here a party's signing, sealing and acknowledging a voluntary deed, and even the proving it to be recorded are held insufficient, as in *Jones vs. Bush*, 4 *Harring*. 7. But if the conveyance be for a valuable consideration and absolute on its face, the intention to consummate the conveyance by the delivery of the deed as a muniment of title is inferred from the grantor's parting with the possession of it whether it be to the grantee directly or to some third person—if he part with it without any condition or reservation. And it has even been held in cases where the intention to pass the title immediately was beyond doubt, that, although the deed remained in the grantor's possession, the law, in order to give effect to the transaction according to the clear intention of the parties and to prevent injustice, will presume a delivery of the deed, and treat the grantor as the custodian of the grantee. 4 *Kent Com.* 456; *Garnons vs. Knight*, 5 *B. C.& *671; *Scrugham vs. Wood*, 15, *Wend.* 545 ; *Pennel's lessee vs. Weyant et al.*, 2 *Harr.* 508. The further fact of a change of possession of the premises in accordance with the title shewn by the deed in addition to the fact that the grantor has parted with the deed, and especially where time has elapsed before the question is raised, must greatly strengthen or rather make absolutely conclusive the presumption of delivery though none were proved. It must be apparent that in the case of ordinary conveyances for a valuable consideration, a rule requiring formal proof of delivery would be intolerably mischievous to titles. The

question then must be treated as one of intention, to be determined by all the circumstances of the case.

In the present case the precise question is, with what intention did Mrs. Houston, after executing this deed, leave it in the possession of Esquire Huston? Was it left with him as her agent, subject to her further control and direction as to its final disposal? or, was it left with him as an escrow, to await the performance of some condition on the part of Jamison and then to be delivered to him? or, was it tacitly left in Huston's hands for Jamison as the consummation of the conveyance purporting to be made by the deed on its face, Huston retaining it temporarily as is usual with scriveners, to add his certificate of the acknowledgment? According to my best judgment upon all the circumstances, the last named was the true purpose of this transaction. In the first place such is the fair and natural construction of the naked transactions proved to have taken place at Huston's office. It is shown that the parties were then together for the purpose of executing this deed. The deed was signed, sealed, attested and acknowledged before a Notary. [The witness Gray did not see Mrs. Houston sign her name, but it was on the paper: and he attested it at the Notary's request, which, being in her presence, was in effect her request. No objection is taken to the formal signing, sealing and acknowledgment of the deed.] Mrs. Houston is shown to have been an intelligent and cautious woman, and no suspicion of undue influence or circumvention, affecting the execution of the deed, is raised. She must be taken to have understood that this deed was a conveyance of the Jamison corner farm, and that having been signed and sealed, a delivery of it would pass the title. Yet she left it in the hands of Huston without condition or reservation and never afterwards called for it or appears to have concerned herself about it. The presumption is that Mrs. Houston treated the conveyance as consummated, left the deed as Jamison's title paper, and that it remained

in Huston's hands to receive his certificate of the acknowledgment, The presumption is strengthened by the known usual course of business where titles are made through the intervention of scriveners. Generally they are employed by the purchaser, they receive for him and temporarily hold the title papers, for the opportunity of adding the certificate of acknowledgment, being often notaries or justices, as well as scriveners, and not unfrequently they have the papers recorded. In all such cases the legal delivery to the grantee is complete when the deed is left in the hands of the scrivener or notary irrespective of the lapse of time during which the scrivener or notary may happen to retain it. Any other rule would extremely distress and jeopardize the the business of title making. This construction of the transaction at Huston's office is in accordance with a principle long adjudged, that when the usual formalities of execution take place in the presence of both parties without any condition or qualification inconsistent with the face of it expressed at the time and the grantor parts with the possession of the deed, he will be presumed to have done so for the purpose of consummating the conveyance. This was held in the ancient cases, when there was a more general adherence to technical forms than now. They are cited and approved by Chancellor Kent, in *Souverbye vs. Arden,* 1 *Johns. Chy.* 256 ; and the principle is applied in that case under circumstances certainly not stronger in favor of a delivery than in the present case. In the next place, upon the question in what character Huston held this paper after its execution, whether as Jamison's agent or Mrs. Houston's, evidence both pertinent and forcible, may be drawn from the manner in which he dealt with it. How did he treat it, whether as Jamison's title paper or whether as a mere deposit with him subject to Mrs. Houston's further order, or whether as an escrow. I think, upon consideration of the point, that Huston's treatment of the paper, though

it was *res inter alios acta*, is admissible after his death, as evidence explanatory of the character of his possession of it, upon the same principle which admits declarations accompanying an act, as part of the *res gestæ*. Now, Huston unequivocally treated the deed as Jamison's title paper, so using it and reciting it in the release executed by James Jamison's widow of her right of dower in the same premises ; and also by delivering the deed to Jamison as his property, after inquiry for it had been awakened by Mrs. Houston's death. This latter fact though resting upon the statement of Jamison himself to the witness, Appleton, is made evidence by the complainants, and all the circumstances of the case lead me to credit it. That the deed slept so long in Huston's possession uncalled for is a circumstance not so rare or strange in the business of conveyancers as to have any special significance. It was evidently overlooked until Mrs. Houston's death drew attention to it ; and that is a sufficient explanation, in connection with Mr. Jamison's general inattention to the recording of his title papers, of the fact, commented on, that this deed was not recorded until after Mrs. Houston's death. We pass next to a consideration, which is always of very material bearing and generally conclusive one way or the other, upon the question of delivery ; that is the subsequent condition of the property described in the deed, whether the possession of it were retained by the grantor or were assumed by the grantee. Upon this point, on a close scrutiny of the testimony, I do not find that Mrs. Houston, after the date of this deed, exercised any acts of ownership over the corner farm, except to remain on it for some lapse of time not definitely fixed, after which she removed to Thomas Jamison's house, where she remained until her decease, nothing occurring in the meantime so far as the testimony shows, to indicate any interest on her part in the farm she had left. Meanwhile before as well as after the removal of his mother from the corner farm, as all the witnesses

testify, Thomas Jamison managed that farm.  I lay no
stress upon the argument of his counsel that he bought
other lands and farmed this tract and the lands bought in
one body ; for on that point the evidence is not clear.  But
treating the corner farm as separately farmed, still the
clear result of the testimony is that he dealt with it in all
respects apparently as he did with his adjoining lands;
whether he improved it more or less is not material,
though the weight of the testimony is that the corner
farm was put and kept in better condition than Jamison's
adjoining lands.  There is no proof that the like exclusive
possession of this farm was held by Jamison before the
date of this conveyance.  Now the effect to be given to
the evidence of Thomas Jamison's possession of the farm,
I take to be this :—that such possession being in accord-
ance with the title shown by a deed, proved to have been
executed by Mrs. Houston, and left with the conveyancer
under the circumstances before stated must be treated as
a possession under the deed, in the absence of proof to
the contrary.   There is a total absence of such proof to
the contrary.   Not the slightest act on the part of Jami-
son recognizing Mrs. Houston as a lessor, or on her part
assuming to be such, is in evidence.   The impression of
Mr. Appleton that Jamison was a tenant, being supported
by no fact stated by him, is not evidence.   But further,
while there is no evidence of tenancy to contervail the
natural presumption that Jamison was dealing with the
farm as owner under the deed, that presumption is con-
firmed by his extinguishing Mrs. Jamisons' right of dower
in the farm, taking as he did, not an assignment of it
under the statute, which would have been the natural
course if he were not acting as the owner of the farm ;
but taking a release of the dower to himself as such owner
in fee simple expressly declared in the release to have be-
come such under the deed from Mrs. Houston.  This
transaction of Jamison is admissible, not to prove title in
himself, but as an act accompanying his possession and

shewing the character of it as a matter of fact, not of right, upon the same principle which admits declarations of a deceased person in possession of land to explain or qualify such possession, and that too according to the best authorities, although the declarations are not against the interest of the persons making them. There was a circumstance relied on as rebutting the presumption that Jamison held the farm as owner of it, viz. : his omission to have the assessment transferred to his own name until after Mrs. Houston's death. At the date of this deed, August, 1848, the farm stood assessed to James Jamison's estate. The next real estate assessment was in the early spring of 1849, no transfer had been made in the assessment upon George Houston's purchase in 1846, nor upon his decease, and the change of title to Mrs. Houston in 1847 ; nor was any transfer made to Thomas Jamison in the new assessment of 1849. The next real estate assessment was in 1853, when this farm was assessed to Thomas Jamison. Now there is a consideration which deprives the omission to assess the farm to Thomas Jamison in 1849 of that force which otherwise it might have, that is, the evident total oversight of several changes of title which had occurred since the prior assessment of the land in 1845 to John Jamison. Had the same in 1849 been newly assessed to Mary Houston as the then owner, the circumstances might have had some significance, though whether enough to overcome the presumptions otherwise arising that Jamison held possession as owner is doubtful, but the continuance in 1849 of the assessment of 1845, notwithstanding several intervening changes of title, clearly shows that the assessor made his new assesssment from the old one without inquiring as to changes of title, and the omission of Jamison himself to look after the matter is reasonably accounted for by the very short time which elapsed between the date of the deed in August, 1848, and the making of the new assessment in the following winter. I cannot, therefore, make this cir-

cumstance weigh sufficiently against the conclusion from the other evidence that Jamison held and dealt with this farm as his own pursuant to the deed, and not as Mrs. Houston's tenant.

Passing now from the acts of the parties in connection with the property, consider the effect of certain declarations on the part of Jamison after Mrs. Houston's death, relied upon as tending to prove that no effectual conveyance of the farm had been made to him in her lifetime. Among these declarations those made to Appleton, Biddle and Vandegrift, being all made within a short period and manifestly under the same prompting, may throw light upon each other and should be considered in one view. First, are the two conversations with Appleton. One of them was on or about the day of Mrs. Houston's death. In the course of that conversation, alluding to the corner farm, Jamison said " that his mother had died very sud- " denly and had not made him a deed for the property. " that he had bought it, but had not received a deed for " it." Two weeks afterwards, in another conversation with the same witness, Jamison stated " that he had found " the deed for the farm ; that his mother had left the deed " with Esquire Huston and that Eugenia Huston had given " him the deed." Between these two conversations, occurred the ride to New Castle with Biddle. The witness says it was "shortly after" Mrs. Houston's death during this ride some allusion being made to the corner farm, Jamison said " that he had no deed for that farm." Last among this class of conversations is the one with Vandegrift. He fixes no time for it ; but it was certainly after the deed had come to Jamison's possession, and after a report of his having no deed had got into circulation in consequence of his first statements to that effect. It was to correct this report that he called on Vandegrift and showed him the deed, and Vandegrift read it.

·Now, taking these declarations by themselves it is

impossible to read in them any thing like a disclaimer by Jamison of title in the farm, but the contrary, that he had bought the farm,—for so he expressly stated to Appleton in the first conversation,—but that he had received no deed for it.   Were this the whole evidence touching the execution and delivery of a deed we should of course rest upon it and say there was none,—but we cannot do this in the face of the direct proof that the deed was executed and that it was left by Mrs. Houston with Esquire Huston under circumstances, such as have already been fully considered, amounting to a delivery.   Nothing is left to us but to allow these conversations to harmonize themselves as they naturally do, with the facts proved by attributing Jamison's declarations at first that he had received no deed, to his anxiety upon finding none among his papers and not clearly recollecting the transaction at Huston's office, a lapse of attention certainly remarkable, and yet demonstrated by the facts.   It seems clear to me that, so far as the conversations with Appleton, Biddle and Vandegrift go, they strengthen the defense.   But this brings us to the testimony of Knowles and James H. Hudson which are adverse to the defendants.   Knowles states that in a conversation about two weeks after Hudson's death the witness asked Jamison if the children (*i. e.* of James Jamison) would have any thing ; to which Jamison replied that " they would have the farm ; that there was " nothing to keep them out of it ;" and after some further talk which the witness does not remember, Jamison said, " he would like to own it, but he could not get it until " the children grew up."   The other witness Hudson speaks to a period as late as July, 1861, nine years after Mrs. Houston's death.   This witness, being as he states overseer of the corner farm under Jamison, advised him to put up a new granary, to which after some intervening conversation, Jamison replied that " he never expected to " put up one here," meaning on the corner farm, " for the " reason that if the boys (meaning the sons of James Jami-

" son) went about it right they could take the farm away " from him as the deed he then held was not worth that," snapping his thumb and finger together. These witnesses, upon cross-examination, do not profess to give the precise words used, but their substance and effect. Considering Knowles' extreme age, that he does not profess to remember and indeed could not remember the words used, and that this conversation with him was immediately after Mrs. Houston's death, the declarations to Knowles like those to Appleton and Biddle would naturally connect themselves with Jamison's apprehension that he had no deed for the farm.—But the declarations of Jamison testified to by the remaining witness, Hudson, as having been made while Jamison had the deed in his possession imply beyond all explanation to the contrary, his own apprehension at least of some fatal infirmity in the title.

The testimony of this witness alone, or at most, with Knowles' connected with it, is the only evidence throwing any doubt upon the title of Jamison, and must become the sole ground of support to a decree, should one be made, setting aside the title. Is it a sufficient ground ? I am not able so to declare. This is evidence of too infirm a nature to overcome the *prima facie* title so strongly supported by the testimony at large as this seems to be. It has two infirmities :—one is that it rests upon the memory of conversations long past—one of the witnesses, Knowles, speaking at the age of ninety years, as to a casual conversation held nineteen years before, cannot, however honest, be at all reliable for accuracy— and as to the other witness, Hudson, although he speaks at less risk of inaccuracy, yet his recollection as to words used ten years before, being not only uncorroborated by the established facts of the case, but in conflict with them, would be not a strong support for a decree of any sort, and certainly an unsafe one where title to real estate is to be affected. Then, again, this testimony, assuming its

accuracy, would not, either by itself or connected with any other proof in the cause, enable the court setting aside the title to assign as it should be able to do the specific defect upon which its action in making the decree proceeds. The utmost effect of this testimony is to raise a suspicion of something wrong ; it proves no definite ground upon which the court can decree the deed inoperative ;—as that it was not in fact executed and delivered ;—or that, if so, the execution and delivery was procured by fraud ;—or that the deed was delivered as an escrow. Then consider on the other hand against what this testimony is adduced. It is a title *prima facie* well established,—resting as it does upon a deed which was incontestably proved to have been executed by Mrs. Houston, under circumstances excluding suspicion of fraud or undue influence,—with strong presumptive evidence of delivery, absolutely and not as an escrow ;—followed by an undisturbed possession held through many years, during five of which the possession was in the life-time and under the eye of Mrs. Houston. Now it must be a sound principle that a *prima facie* title to real estate shall not be set aside upon mere-suspicion but upon proof only ;—and the proof must be sufficiently definite as to the ground of the defect to enable the Court to know what it is doing ;—and further the necessity for this caution in dealing with titles on the part of a court of equity is certainly much increased where a long time has elapsed and all the parties to the original transaction are dead. Mr. Rodney's view of Knowles' and Hudson's testimony was presented with great force and at the time impressed me strongly. It was that Jamison's admission of some defect, connected with the non-payment of the purchase money evidenced by the want of Mrs. Houston's signature to the receipt and the absence of any increase of her assets, would warrant the inference that the deed was left with Esquire Huston as an escrow until payment of the purchase money and that it

failed upon her death without performance of the con-
dition. But after weighing all the evidence I cannot feel
that the general presumption of an unqualified delivery
of the deed to Huston, followed by strongly corroborating
acts of the parties in Mrs. Houston's lifetime, is sufficiently
overcome by a bare inference of its being an escrow drawn
from testimony in its nature not strongly reliable for
accuracy, and which even taking it to be accurate, only
remotely supports the inference sought to be drawn from
it ; for the words stated to have been used by Jamison are
altogether inconclusive in their application, pointing no
more to the deed having been delivered as an escrow,
than to any other defect of title under it. My impression
from all the circumstances is that the purchase money
was not paid, but that Mrs. Houston suffered the deed to
pass finally from her control without requiring that the
payment of the purchase money should be a condition of
its passing the title, trusting her son for the consideration
tion This solution of the case although not perfectly
satisfactory is the best I can reach. At all events the
case presents itself as one which the death of all the par-
ties has left without sufficient evidence of the actual trans-
actions between them to warrant this Court in interfering
with the title as it is now held.